IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Aaron Addison, | Case No. 1:10 CV 2512 |
| Petitioner, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Keith Smith, *Warden*, | |
| Respondent. | |

### INTRODUCTION

Petitioner Aaron Addison filed a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). The Magistrate Judge's Report and Recommendation ("R&R") recommended this Court dismiss the Petition in part and deny in part (Doc. 19 at 2). Petitioner objects to "each and every adverse finding by the Magistrate Judge" (Doc. 22 at 1). In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. §§ 636(b)(1)(B) & (C), this Court has reviewed the determination of the Magistrate Judge *de novo*. For the following reasons, this Court dismisses the Petition in part and denies in part.

### BACKGROUND

Petitioner is currently incarcerated by the State following jury convictions for one count of aggravated murder and two counts of attempted murder, and a bench conviction for one count of possessing a weapon while under disability. For these crimes, Petitioner is serving a combined sentence of life without the possibility of parole, plus concurrent terms of five and ten years (Doc. 1).

The evidence adduced at trial describing Petitioner's crimes was set forth by the Ohio Eighth District Court of Appeals on direct appeal:

> {¶ 4} On a Saturday night in August 2006, codefendant Reginald Wilmore ("Wilmore") went to the apartment of Latrice Cromwell ("Latrice"), who lived in a Cleveland Metropolitan Housing Authority apartment. Latrice operated a "convenience store" out of her apartment, selling snack items, soft drinks and beer. Latrice and her boyfriend also sold cocaine and marijuana out of her "store." Wilmore wanted to buy a beer from Latrice, but she would not sell him any because she did not know him. Latrice's friend closed the door on Wilmore, so he angrily kicked the door. Latrice opened the door and Wilmore punched her, knocking a cell phone from her hand. A fight ensued, and Wilmore left when Latrice called police.
>
> {¶ 5} Latrice testified that Wilmore returned with two other men, one of whom was holding a baseball bat. The two groups engaged in a "verbal battle" before Wilmore's group eventually left. Wilmore returned alone and apologized to Latrice. He asked whether she had found a key he claimed he had lost during the altercation. Latrice refused to return the key and told him she would give it to police. Wilmore told Latrice that "it's not over b* * * " and walked away.
>
> {¶ 6} Latrice then called her boyfriend, Carlos Holder ("Holder"), to tell him about the fight. Holder and Latrice's cousin, Charles Cromwell ("Charles"), came to her apartment, joined by Holder's cousin. After hearing what happened, Holder called two more of his friends and asked them to come over. The four men went out to look for Wilmore, leaving Charles behind with Latrice.
>
> {¶ 7} The four men came upon a small group of people that included Addison, whom they knew by the nickname "Wax," and Ricky Ogletree ("Ogletree"). Wilmore was not with the group. Ogletree testified that Holder pointed his finger at him, and started to say something when three other men came running up and started shooting. Ogletree testified that he ran and someone shot at him. Holder denied having a gun that evening but admitted that two of the men with him might have had guns. Holder claimed that some of the men in Addison's group also had guns.
>
> {¶ 8} Latrice and her friend testified that they heard shooting just a few minutes after the four men left. Holder returned to the apartment, afraid that Addison and his friends were going to retaliate against him. He told the women to gather the children and go across the street to his aunt's house. They spent Sunday at a friend's house.
>
> {¶ 9} On Sunday evening, Latrice and Holder returned to her apartment. Fearing that there would be trouble, Holder went to his aunt's house and got his gun.

{¶ 10} Another witness who lived near the shooting site testified that shortly before the shooting, she had been walking to buy drugs when she saw Wilmore talking with two other men near Latrice's apartment. She testified that Wilmore was holding a shotgun. A few minutes later, the witness was walking back along the same route and saw Wilmore standing with four or five other men, one of whom she identified as Addison. Wilmore still carried the shotgun, and when she walked by them, she heard someone say, "What is we gonna do? She can get it too, let's make it happen." The witness kept walking, but before she could get to her apartment, she heard the sound of weapons discharging, including a shotgun and what sounded like "mild shots."

{¶ 11} Latrice testified that on the evening of the shooting, Addison came to her porch holding a shotgun. She testified that Addison told her to leave with her daughter and send Holder outside. Holder testified that Latrice came back inside the apartment and told him that Addison had threatened to shoot up the house and was outside with a shotgun. Charles was also in the apartment, asleep on the kitchen floor. Latrice awakened Charles and took her child into her bedroom.

{¶ 12} An upstairs neighbor overheard Latrice talking to two men. The neighbor testified that she heard one of the men tell Latrice that he was not trying to disrespect her but that they wanted Holder out of her house. The neighbor observed that the men each carried shotguns. The neighbor went down to Latrice's apartment and invited them to her apartment for safety. Moments later, the neighbor testified she heard gunshots and ran into the bedroom closet with Latrice.

{¶ 13} One of the gunshots hit Charles in the head, killing him. Holder went into the living room where Charles had been shot and fired out the window. A bullet grazed Holder in the shoulder.

{¶ 14} Latrice testified that she saw Addison's purple convertible leaving the scene at a fast rate. Ogletree testified that he saw Addison later that evening at a party, and Addison told him that "someone got shot."

{¶ 15} The police recovered five shell casings from a 9mm firearm outside the apartment, all of which were fired from the same weapon. No shotgun shells were recovered, but the police found a number of "defects" in the porch screen door and the brick wall surrounding the screen door. A police expert testified these defects were consistent with multiple projectile shotgun rounds. Other defects were located in the window frame that were also consistent with being shot from a shotgun. The expert further testified that he examined Holder's gun but, in his opinion, the fragment recovered from Charles's body could not have been fired from Holder's gun.

{¶ 16} The coroner testified that the bullet that struck the victim had traveled through his brain in a slightly downward trajectory. The coroner said the trajectory of the bullet did not rule out the theory that it had been fired from outside the apartment.

> {¶ 17} A police detective testified regarding three oral statements Addison made to police while in custody. Addison told detectives he was with friends the night before Charles was shot when Holder "and his boys ran up on them." Addison stated that one of the men with Holder asked him if he had a problem with Latrice and then began shooting at them. Addison also told police that he went to Latrice's the next night and spoke with her. He denied having a gun or shooting anyone. During his second oral statement, Addison told detectives that he had spoken with Wilmore in jail, and Wilmore had told him that a man named "Fiend" was the other shooter. Addison told detectives that Wilmore had the 9mm gun and "Fiend" had a shotgun. The detective testified that through his investigation he concluded that "Fiend" did not exist.
>
> {¶ 18} The court sentenced Addison to life without the possibility of parole for aggravated murder, ten years for attempted murder, and five years for having a weapon while under a disability, with the sentences to be served concurrently.

*State v. Addison*, 2009-Ohio-221 at ¶¶ 4–18 (Ohio Ct. App. 2009).

Petitioner raised six assignments of error on direct appeal to the Ohio court of appeals: (1) insufficient evidence to support his convictions for aggravated murder and attempted murder; (2) his convictions were against the manifest weight of the evidence; (3) ineffective assistance of trial counsel for failure to request an instruction for the lesser-included offense of involuntary manslaughter; (4) the trial court abused its sentencing discretion; (5) the trial court unconstitutionally allowed the admission of hearsay evidence of statements made by Petitioner's girlfriend to a detective; and (6) the prosecutor committed misconduct by arguing different theories of culpability in Petitioner's trial and the trial of co-defendant Wilmore, and, relatedly, trial counsel was ineffective for failing to object to such arguments by the prosecutor (Tr.[1] at 149–63, 168–76).

In January 2009, the court of appeals rejected each of Petitioner's claims. *Addison*, 2009-Ohio-221. Petitioner next filed *pro se* a notice of appeal and a motion to file a delayed appeal to the Ohio Supreme Court in April 2009 (Tr. 251–84). In June 2009, the Ohio Supreme Court granted

---

[1] "Tr." refers to the Rule 5 material filed by the State on April 28, 2011 (Docs. 10-2 & 10-3).

Petitioner's motion, accepted his delayed appeal, and ordered Petitioner to file a memorandum in support of jurisdiction within thirty days (Tr. 285). Petitioner timely filed *pro se* a memorandum (Tr. 286). The Ohio Supreme Court dismissed Petitioner's appeal in November 2009, finding it did not involve any substantial constitutional questions (Tr. 325).

In the meantime, in April 2009, Petitioner filed with the state court of appeals a *pro se* application to reopen his case pursuant to Ohio Appellate Rule 26(B), arguing for the first time that his trial counsel was ineffective for failing to secure an expert witness to testify about ballistics or the trajectory of bullets (Tr. 326–27). The Ohio court of appeals denied the Rule 26(B) application in June 2009 (Tr. 347). Petitioner filed *pro se* a notice of appeal and a memorandum in support of jurisdiction with respect to that decision (Tr. 353–66). The Ohio Supreme Court dismissed that appeal in September 2009 as not involving any substantial constitutional question (Tr. 376).

Petitioner next filed the instant Petition in November 2010, raising four grounds for relief: (1) the State presented insufficient evidence to support his convictions; (2) trial counsel was ineffective for failing to secure an expert witness on ballistics; (3) the prosecutor committed misconduct for arguing different theories of the case at his trial and Wilmore's trial; and (4) the prosecutor elicited hearsay evidence during trial in violation of the Confrontation Clause.

### STANDARDS OF REVIEW

When a federal habeas claim has been adjudicated by the state courts, 28 U.S.C. § 2254(d)(1) provides the writ shall not issue unless the state decision "was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." A federal court may grant habeas relief if the state court arrives at a decision contrary to the Supreme Court of the United States on a question of law, or if the state court decides

5

a case differently than did the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). The appropriate standard is whether a state court's application of clearly established federal law was unreasonable, and not merely erroneous or incorrect. *Id.* at 409–11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). This is a demanding standard met "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Moreover, "[i]n situations in which a petitioner has failed to fairly present federal claims to the state courts, and a state procedural rule now prohibits the state court from considering them, the claims are considered procedurally defaulted." *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) (citing *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002)). "While in such situations the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner . . . the petitioner's failure to have the federal claims considered in the state courts results in a procedural default of those claims that bars federal court review." *Id.* at 605 (citations omitted). The Sixth Circuit applies a three-part test to determine if a claim is procedurally defaulted: (1) a state procedural rule applies to petitioner's claim and petitioner failed to comply with it; (2) the state actually enforced the procedural sanction; and (3) the state procedural forfeiture is an "adequate and independent" state ground on which to foreclose federal habeas review. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

6

**DISCUSSION**

**Ground One: Insufficient Evidence**

Petitioner maintains the State presented insufficient evidence to sustain his jury convictions for aggravated murder and attempted murder because no one testified that he or she witnessed Petitioner shoot a gun. The R&R concluded that the Ohio court of appeals' determination that the evidence at trial supported Petitioner's convictions was not an unreasonable application of clearly established federal law (Doc. 19 at 22). After a *de novo* review of the record, this Court agrees.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), the relevant question for a sufficiency-of-the-evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, \_\_\_U.S.\_\_\_\_, 132 S. Ct. 2, 4 (2011) (per curiam).

In rejecting this claim, the Ohio court of appeals outlined the elements of aggravated murder and attempted murder, noting that under Ohio law, intent can be inferred from "the presence, companionship, and conduct of the defendant before and after the offense is committed." *Addison*, 2009-Ohio-221 at ¶ 25 (internal citation and quotation marks omitted). The court of appeals identified circumstantial evidence presented at trial supporting Petitioner's convictions, including:

- Wilmore had engaged in a physical altercation with Latrice;

- Holder and others went looking for Wilmore and found Petitioner, at which time an argument ensued and shots were fired at Petitioner;

- Witnesses observed Wilmore and Petitioner with guns outside of Latrice's apartment minutes before the fatal shooting and the witnesses overheard the two say "let's make this happen";

7

- Petitioner admitted to police he was upset about being shot at the day prior to the murder;

- Petitioner admitted that he met with Wilmore the night of the murder;

- Petitioner admitted to police that he was at Latrice's apartment around the time of the murder; and

- Latrice testified that Petitioner was holding a gun when he appeared at her door immediately before the murder to tell her to leave and send Holder outside.

*Id.* at ¶¶ 26–32.

Petitioner's convictions are supported by this circumstantial evidence, which is sufficient to survive a sufficiency-of-the-evidence challenge. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.") (internal citations and quotation marks omitted). Given the circumstantial evidence supporting a reasonable inference that Petitioner participated in the aggravated murder and attempted murder, this Court adopts the R&R's conclusion that the Ohio court of appeals' conclusion was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Rather than arguing the evidence presented at trial was insufficient to support the convictions, Petitioner takes a different tack in his Traverse and Objection to the R&R. In those briefs Petitioner argues, for the first time, that the trial court erred by giving incorrect or confusing jury instructions which addressed the legal principle of transferred intent (Doc. 22 at 2–10). Petitioner further appears to argue that the jury instructions rendered the indictment insufficient (*id.*). The Magistrate Judge

8

found any such arguments to be procedurally barred because Petitioner did not raise them to the state courts, nor did he include them in his Petition to this Court (Doc. 19 at 21–22).

Petitioner objects to the Magistrate Judge's characterization of these arguments as new and different (Doc. 22 at 2). Petitioner claims the arguments are not new and fit under a sufficiency-of-the-evidence rubric because "[a]ll that [he] was doing was relating what was contained in the trial record which was before the court" (*id.*). Petitioner cites *Satterlee v. Wolfenbarger*, 453 F.3d 362 (6th Cir. 2006), in support of his contention that he is not procedurally barred from presenting his faulty jury instructions/indictment argument. That case, however, does not support Petitioner's attempt to restyle his sufficiency-of-the-evidence argument into a claim relating to jury instructions and the indictment.

In *Satterlee*, the petitioner argued throughout his appeals to the state courts that his trial counsel was ineffective for failing to communicate to him a plea offer for a 3–7-year sentence. *Id.* at 366. The state argued petitioner did not exhaust the claim because he argued for the first time to the federal courts that counsel's failure was premised on a different plea offer which counsel also failed to relay to petitioner -- a 6–20-year plea offer. *Id.* But, as the Sixth Circuit noted, petitioner had included factual allegations about the 6–20-year offer in his briefing to the state courts, even though his argument to that court largely focused on the 3–7-year offer. *Id.*

Here, Petitioner is not attempting to further flesh out his sufficiency-of-the-evidence claim with additional facts already in the record, as was the case in *Satterlee* and other cases he cited in support of his objection. *See also Richey v. Bradshaw*, 498 F.3d 344, 353 (6th Cir. 2007). Petitioner here is not citing supplemental evidence to support his claim. Instead, he is attempting to completely restyle the legal basis of his first claim as an assertion of error with respect to the jury instructions and

9

the indictment. Petitioner did not fairly present this legal claim to the state courts, or in his Petition to this Court (Doc. 1). This Court agrees with the R&R and finds such arguments to be procedurally barred.

### Ground Two: Ineffective Assistance of Counsel for Failing to Secure Expert Witness

Petitioner next argues trial counsel was ineffective for not calling an expert witness to demonstrate that he could not have committed the crimes as alleged. The State argues this claim is procedurally barred because Petitioner failed to properly raise it to the Ohio courts.

On direct appeal, Petitioner's ineffective assistance of counsel claim was premised on trial counsel not requesting an instruction for the lesser-included offense of involuntary manslaughter (Tr. 158–61). That was the claim analyzed by the court of appeals. *Addison*, 2009-Ohio-221 at ¶¶ 40–41 (noting that "the decision whether to request a jury instruction with regard to a lesser included offense constitutes trial strategy and does not establish ineffective assistance of trial counsel" and finding Petitioner was not denied effective assistance).

Petitioner attempted to raise the ineffective assistance argument he now advocates in his Rule 26(B) application to the state court of appeals, arguing appellate counsel was ineffective for failing to include the claim in Petitioner's original appeal (Tr. 326–27). The appellate court denied the application, finding appellate counsel was not ineffective because there was no evidence in the record addressing what evidence such an expert would have offered (Tr. 352).

The R&R recommended this Court find Petitioner's second ground for relief procedurally defaulted (Doc. 19 at 23). Petitioner objects, arguing the "[t]he Magistrate Judge erroneously concluded that an application to reopen an appeal pursuant to Rule 26(B) of the Ohio Rules of

10

Appellate Procedure cannot bootstrap an unmade claim of ineffective assistance of trial counsel" (Doc. 22 at 11).

Under Ohio law, an application for reopening pursuant to Rule 26(B), or a "Murnahan" motion, "is a procedural mechanism for raising claims of appellate counsel ineffectiveness, not for bootstrapping underlying constitutional claims that were omitted from the direct appeal in the first place." *Stojetz v. Ishee*, 389 F. Supp. 2d 858, 899 (S.D. Ohio 2005). Fair presentment requires a petitioner to present his claims to the state courts in a procedure and manner that will provide them with the opportunity to apply controlling legal principles. *Picard v. Connor*, 404 U.S. 270, 276–77 (1971). Raising a claim in a Rule 26(B) application that is denied is not the equivalent to raising that claim on direct appeal for issue preservation purposes. *See id*; *Jalowiec v. Bradshaw*, 2008 WL 312655, at * 24 (N.D. Ohio 2008); *Gordon v. Bradshaw*, 2007 WL 496367, at *2 (N.D. Ohio 2007). Thus, Petitioner's Rule 26(B) application could have preserved a claim for ineffective assistance of appellate counsel, but it cannot operate to preserve Petitioner's ineffective assistance of counsel claim for not retaining an expert.

Petitioner further maintains the court of appeals erred when it concluded appellate counsel was not ineffective, stating that the court of appeals "cavalierly dismissed" the claim "without looking to the merits of the claim" (Doc. 22 at 11). Not so. The court of appeals considered Petitioner's claim and reasoned in its opinion that appellate counsel was not ineffective because there was no evidence as to what testimony a ballistics expert would give (Tr. 347–52). A petitioner raising an ineffective assistance of appellate counsel claim must demonstrate that counsel was objectively unreasonable "in failing to find arguable issues to appeal -- that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and that but for this failure, there is a

11

reasonable probability petitioner would have prevailed on his appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Without evidence that a ballistics expert would testify favorably, appellate counsel's decision not to pursue an ineffective assistance of counsel claim on that basis was more than reasonable. *See id.*

Petitioner also devotes pages in his Objection brief arguing in support of the ineffective assistance of counsel claim raised on direct appeal -- that trial counsel was ineffective for not requesting an instruction on the lesser-included offense of involuntary manslaughter (Doc. 22 at 11–13). That claim, however, was not included in the Petition (Doc. 1) and is therefore not properly before this Court. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005). In any event, this Court adopts the state court finding that it was sound trial strategy for trial counsel not to request such an instruction. *See Harrop v. Sheets*, 430 F. App'x 500, 506 (6th Cir. 2011) (finding trial counsel's decision not to request jury instruction for lesser-included offense of voluntary manslaughter in murder prosecution was reasonable trial strategy).

**Ground Three: Prosecutorial Misconduct**

Petitioner claims he suffered a due process violation as a result of prosecutorial misconduct. Specifically, Petitioner maintains that the prosecutor committed misconduct by arguing inconsistent theories of culpability at Petitioner and Wilmore's separate trials. To maintain this claim on direct appeal, on July 11, 2008, Petitioner filed a motion to transfer the transcript from Wilmore's appeal to make it part of the record for his appeal (Tr. 432). The court of appeals granted this motion on July 15, 2008, and Petitioner filed Wilmore's transcript two days later (*id.*). The State then filed a motion to strike Wilmore's transcript on August 4, 2008 (*id.*). The court of appeals granted the State's motion on January 13, 2009 (Tr. 431), ultimately finding that Wilmore's transcripts "were not part

of the record below in [Petitioner's] case; thus we cannot consider them." *Addison*, 2009-Ohio-221 at ¶ 57. In so holding, the court of appeals noted that "[s]uch evidence is allowed in a petition for postconviction relief." *Id.*

Even though the court of appeals declined to consider the issue and left it for collateral review, by the time the court of appeals directed Petitioner to raise this claim in a postconviction petition, 180 days had passed since the date the trial transcript was filed with the court of appeals (January 18, 2008), rendering any such postconviction attempt untimely. *See* R.C. § 2953.21; *State v. Everette*, 129 Ohio St. 3d 317, 323 (2011) (noting that 180-day period to file a petition for postconviction relief runs from the filing of the certified, written transcript).

The State contends Petitioner's prosecutorial misconduct claim suffers from two procedural defects -- that the claim is both unexhausted and procedurally defaulted. The R&R rejected the State's exhaustion argument, recommending any technical lack of exhaustion be excused as futile at this juncture, but accepted the State's contention that this claim is procedurally defaulted (Doc. 19 at 25–26).

### *Exhaustion*

An application for a writ of habeas corpus by a state prisoner shall not be granted unless the petitioner has exhausted available state court remedies, there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the petitioner's rights. 28 U.S.C. §§ 2254(b), (c); *see also Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005). A court may excuse exhaustion "where further action in state court would be an exercise in futility." *Turner*, 401 F.3d at 724 (internal citation and quotation marks omitted).

13

The State faults Petitioner for failing to bring his prosecutorial misconduct claim in a postconviction relief petition after the court of appeals instructed him such a petition was the proper vehicle for such a claim (Doc. 10 at 25). Nevertheless, by the time the court of appeals struck Wilmore's trial transcript from the record (after previously granting Petitioner's motion to file the transcript as part of the record), and advised Petitioner that a postconviction petition was the proper vehicle, the 180-day limitation for filing a postconviction petition had already passed. *See* R.C. § 2953.21.

This Court is concerned that the court of appeals' delayed striking of Wilmore's transcript from the record on appeal, coupled with Ohio's 180-day window for filing a postconviction relief petition, rendered the state process ineffective. However, this Court need not reach that question and instead adopts the R&R's recommendation that any technical lack of exhaustion of this claim be excused because the option of filing a late, delayed motion for postconviction relief would largely be an exercise in futility (Doc. 19 at 25) (citing *Turner*, 401 F.3d at 724).

### *Procedural Default*

The State also argues that Petitioner procedurally defaulted this claim "when he failed to bring the claim in his subsequent appeal to the Ohio Supreme Court" (Doc. 10 at 26). The Magistrate Judge agreed and recommended this Court find Petitioner's prosecutorial misconduct claim procedurally defaulted (Doc. 19 at 26). After a *de novo* review of the record, this Court disagrees with the R&R on this point.

A claim is adequately raised on direct appeal if it was fairly presented to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must

14

present his claim to the state courts as a federal constitutional issue -- not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir.1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

On direct appeal to the Ohio court of appeals, Petitioner, then represented by counsel, included the following claim:

> The prosecutor committed misconduct when he introduced and argued inconsistent theories of culpability in [Petitioner's] trial and the trial of his co-defendant, and otherwise engaged in improper argument, and trial counsel was ineffective in failing to object thereto (Tr. 171).

In his *pro se* brief to the Ohio Supreme Court, Petitioner included the following:

> [Petitioner] was denied the effective assistance of counsel . . . when defense attorney failed to object to misconduct by the state wherein the prosecution introduced and argued inconsistent theories of culpability in the trials of [Petitioner] and his codefendant . . . (Tr. 296).

Petitioner's *pro se* brief went on to explain that "[t]his violated [Petitioner's] due process rights and undermines the fundamental fairness of his trial" and cited *Stumpf v. Mitchell*, 367 F.3d 594 (6th Cir. 2004) (Tr. 297). This language sufficiently preserved Petitioner's prosecutorial misconduct claim by identifying the constitutional claim, as well as a federal case employing constitutional analysis. *See Newton*, 349 F.3d at 877. This Court rejects the R&R's conclusion that Petitioner procedurally

15

defaulted by not raising the issue in his brief to the Ohio Supreme Court and now reviews the merits of this claim.

### *Merits of Claim*

Petitioner contends that the prosecution obtained two guilty verdicts at two trials using inconsistent theories: at Wilmore's trial, the prosecution told the jury Petitioner fired the fatal shot that killed Cromwell and Wilmore aided and abetted in the murder, but at his own trial, the prosecution told the jury Wilmore fired the fatal shot and Petitioner aided and abetted (Doc. 22 at 16–17). The State contends that the shooting "was an effort of a group of people" and that the State "did not know who was carrying the nine-millimeter that fired the fatal shot" (Tr. 219). Ohio's aggravated murder statute, R.C. § 2903.01, does not distinguish between principals and aiders and abettors. *Bradshaw v. Stumpf*, 545 U.S. 175, 184 (2005) ("The aggravated murder charge's intent element did not require any showing that Stumpf had himself shot Mrs. Stout. Rather, Ohio law considers aiders and abettors equally in violation of the aggravated murder statute, so long as the aiding and abetting is done with the specific intent to cause death."). Assuming the accuracy of Petitioner's summary of the prosecution's argument, and assuming that inconsistent arguments could violate due process rights,[2] this claim nevertheless fails.

In *Bradshaw*, the Supreme Court confronted the question of whether the use of inconsistent theories voided petitioner's guilty plea. *See id.* at 177–82, 186–87. Without deciding whether such prosecutorial behavior was a due process violation, *id.* at 187, the Court held that any error was

---

[2] In *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), the Supreme Court disposed of the petition without reaching this question. Justice Thomas noted in his concurrence that the Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants on inconsistent theories." *Id.* at 190 (Thomas, J., concurring).

harmless -- or, "immaterial," because under Ohio law, petitioner, even if not the shooter, was guilty of aggravated murder under an aider-and-abettor theory "so long as the aiding and abetting is done with the specific intent to cause death." *Id.* at 184, 186–87.

The same reasoning applies here. Petitioner was convicted of aggravated murder, which required that he "purposely" caused Cromwell's death. *See* R.C. § 2903.01; *Coley v. Bagley*, 706 F.3d 741, 755 (6th Cir. 2013). Petitioner was found to have specifically intended to cause Cromwell's death. Thus, whether aider-and-abettor or actual shooter, Petitioner was equally guilty of aggravated murder. *See Coley*, 706 F.3d at 755–56 ("Classifying [petitioner] as shooter or aider and abettor makes no difference to his guilt of this specification."). Any error as to the alleged statements by the prosecution was harmless, and relief is denied with respect to this claim. *Id.* at 756.

**Ground Four: Confrontation Clause Violation**

In his fourth ground for relief, Petitioner argues he was denied due process and his right to confrontation when the trial court permitted the prosecution to introduce inadmissible hearsay. Specifically, Petitioner argues it was improper to allow a detective to testify that he heard from Petitioner's girlfriend that "Fiend" -- a person Petitioner told police was involved in the crime -- did not exist (Doc. 24-6, Tr. 1025–27). The Ohio court of appeals concluded this testimony was not hearsay because "the statements by the testifying officer were not offered to prove the truth of the statement that the girlfriend did not know 'Fiend,' but rather to show the police followed up on the lead [Petitioner] provided and to explain why the police investigation ruled out 'Fiend' as a suspect." *Addison*, 2009-Ohio-221 at ¶ 54. The Magistrate Judge found the appellate court decision was not contrary to clearly established federal law and recommended this Court deny this claim on the merits (Doc. 19 at 28). Petitioner objects to this finding, arguing the court of appeals misapplied Supreme

17

Court precedent on this issue (Doc. 22 at 20–23). After conducting a *de novo* review of the record, this Court adopts the Magistrate Judge's recommendation and denies relief.

Under *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004), the admission of a statement from an absent declarant does not trigger a Confrontation Clause violation unless the statement is "used as hearsay," which means "it must be offered for the truth of the matter asserted." *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007) (internal citation and quotation marks omitted). Evidence offered for background, to explain how certain events came to pass, or to give context to law enforcement officers' actions is not offered for the truth of the matter asserted and does not trigger a Confrontation Clause violation. *United States v. Warman*, 578 F.3d 320, 346 (6th Cir. 2009) (quoting *United States v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004)).

Here, the detective's testimony about the statements made by Petitioner's girlfriend was used to explain why police did not continue to pursue the individual Petitioner identified as participating in the shooting. Permitting this testimony was not contrary to clearly established federal law.

## CONCLUSION

For the forgoing reasons, this Court adopts the R&R as to grounds one, two, and four, and affirms on ground three for the reasons stated above. This Court dismisses the Petition in part and denies in part. Furthermore, Petitioner has not made a substantial showing of the denial of a constitutional right, so this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

April 30, 2013